IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CBS OPERATIONS INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3-06-CV-0588-L |
| | § | |
| REEL FUNDS INTERNATIONAL, INC. | § | |
| d/b/a REEL MEDIA INTERNATIONAL, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER AND PERMANENT INJUNCTION

Before the court are: (1) Plaintiff's Motion for Summary Judgment, filed December 15, 2006; and (2) Defendant's Motion for Summary Judgment on Liability, filed January 12, 2007. After consideration of the motions, responses, reply,[1] stipulated facts, record, and applicable law, the court **grants** Plaintiff's Motion for Summary Judgment and **denies** Defendant's Motion for Summary Judgment on Liability.

**I.     Factual and Procedural Background**

This is a copyright infringement action involving sixteen half-hour episodes of *The Andy Griffith Show* (the "Show"), a well-known television series that originally aired in the 1960s. The Show was originally broadcast nationwide for eight (8) seasons beginning in the 1960-1961 season and ending in the 1968-1969 season. The following facts are undisputed.[2] Mayberry Enterprises ("Mayberry"), a predecessor-in-interest to Plaintiff CBS Operations, Inc. ("CBS"), produced and

---

[1] Only Plaintiff filed a reply brief. *See* Plaintiff's Reply Brief in Further Support of its Motion for Summary Judgment on Liability and in Opposition to Defendant's Cross-Motion for Summary Judgment.

[2] The parties have provided the court with Stipulated Facts for Summary Judgment. *See* Pl. App. 3-7.

**Memorandum Opinion and Order and Permanent Injunction  - Page 1**

broadcast a total of 249 episodes of the Show. The Show was also distributed nationwide for syndication.

### A.     Original Copyright Registration

Mayberry began registering episodes of the Show for copyright with the United States Copyright Office on or about October 5, 1962. Mayberry registered episodes 1 through 127 (other than episodes 2, 16 and 30) between 1962 and 1965. In or around 1973, Mayberry registered the copyrights in episodes 190 through 219.

Viacom International Inc. ("Viacom"), a predecessor-in-interest to CBS, acquired the rights to the Show in 1978. Viacom registered the copyrights to episodes 2, 16 and 30 in 1988 in the name of Mayberry. In 1992, Viacom registered episodes 128 through 189 and 220 through 249.

### B.     Renewal Registration

Viacom successfully renewed the copyrights in episodes 1 through 79, and 96 through 174 prior to their expiration. Viacom filed renewals for the copyrights in episodes 175 through 235 on March 17, 1997, and for episodes 236 through 249 on February 24, 1997.

In March 1997, Paramount Pictures Corporation, Viacom's successor and a predecessor-in-interest to CBS, submitted renewal applications for episodes 80 through 95 (the "16 Middle Episodes"), as well as sixty other episodes. On June 5, 1997, the Copyright Office rejected the renewal applications for the 16 Middle Episodes as untimely.

The copyrights in the first seventy-nine episodes of the Show were timely renewed and remain in full effect. No separate copyright registrations, apart from those for the individual episodes, exist or have ever existed for the characters in the show, including but not limited to Sheriff Andy Taylor and Deputy Barney Fife, created for and depicted in the first seventy-nine

episodes of the Show. The parties stipulate, however, that those characters are sufficiently distinctive and delineated in the first seventy-nine episodes so as to be independently copyrightable.

As the copyright owner of the registered United States copyrights in all but the 16 Middle Episodes, CBS currently licenses all of the episodes of the Show for broadcast on television, including the 16 Middle Episodes. Pursuant to CBS's licensing program, on any given day of the week, episodes of the Show are being broadcast on many station licensees in the United States. CBS also licenses and distributes episodes of the Show for home video release on VHS videocassettes and DVD, including the 16 Middle Episodes.

### C. Reel Media's Actions

Reel Media stipulates that it has sold, distributed, and/or licensed copies of the 16 Middle Episodes of the Show to, among others, television stations, which have publicly broadcast the 16 Middle Episodes, in some instances, in the same markets and in the same time periods as television stations which broadcast the episodes officially licensed by CBS. Reel Media conducted these activities without CBS's authority or consent.

### D. The Lawsuit

CBS filed this lawsuit on March 31, 2006, alleging copyright infringement by Defendant arising from its distribution and sale of the 16 Middle Episodes. CBS seeks to permanently enjoin Reel Media from reproducing, licensing, selling and distributing the 16 Middle Episodes to television broadcasters without authorization. CBS also seeks damages. The parties have filed cross-motions for summary judgment. CBS contends that it is entitled to summary judgment on its copyright infringement claim against Reel Media, since the statutory copyrights in the first seventy-nine episodes are valid, and the 16 Middle Episodes that follow them in the series contain numerous

fictional characters and themes that are derivative of the copyrighted episodes. Reel Media has moved for summary judgment on liability, contending that its unauthorized sale and distribution of the 16 Middle Episodes is not infringing, since the copyrights in the 16 Middle Episodes were not timely renewed and they are now in the public domain. For the reasons set forth more fully below, and based on the undisputed facts, the court determines that Reel Media's sale and/or distribution of the 16 Middle Episodes infringes CBS's valid copyright in the first seventy-nine episodes of the Show. Accordingly, CBS's motion for summary judgment should be granted and Reel Media's motion for summary judgment on liability should be denied.

## II.     Legal Standard for Summary Judgment

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Ragas*, 136 F.3d at 458. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### III. CBS's Motion for Summary Judgment

To reiterate briefly, CBS contends that under well-established principles of copyright law, the 16 Middle Episodes are "derivative" of the pre-existing copyrighted first seventy-nine episodes, and their sale and/or distribution without authorization from CBS thus constitutes copyright

infringement. In further support, CBS contends that where, as in this case, a non-renewed work is based upon, or incorporates elements from, a pre-existing copyrighted work, only those newly-added elements that are original to that subsequent (or derivative work) are deemed to have fallen into the public domain.[3] Defendant contends that it is not liable for copyright infringement because the copyright in the 16 Middle Episodes has expired, and those episodes are therefore in the public domain. Resolution of the cross-motions for summary judgment necessitates an understanding of federal statutory copyright law as it applies to the undisputed facts presented.

### A. Applicable Copyright Law

Under the Copyright Act of 1909, the duration of federal statutory protection was a two term system, an original term and a renewal term. *See* 17 U.S.C. § 24 (repealed effective 1978) (the "1909 Act"). The 1909 Act provided each author with an initial 28-year term of copyright protection, calculated from the date of publication, which could be renewed for an additional 28 years. *Id.* If the initial copyright term expired prior to renewal, the work entered the public domain. *See generally Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 590 (2d Cir. 1999). If the copyright was renewed, the work entered the public domain at the end of the renewal term. *Id.*[4]

---

[3]CBS has stipulated that any newly-introduced copyrightable element, such as a sufficiently delineated character, plot, or set design, that appears for the first time in one of the 16 Middle Episodes is now in the public domain in the United States, and Reel Media and any other member of the public is free to use those elements of their own works.

[4]In 1976, the 1909 Act was revised in its entirety, and was superseded by the Copyright Act of 1976, codified at 17 U.S.C. § 101, *et seq.* (the "1976 Act"). Under the 1976 Act, the two term system was replaced by a single term lasting the life of the author plus fifty (later extended to seventy) years. Under the 1976 Act, works which had attained federal copyright protection before the effective date of the 1976 Act (January 1, 1978) retained the two term system from the 1909 Act. *See generally* 17 U.S.C. § 304. Effective 1992, renewal registration is no longer required for all works whose renewal term copyrights commenced on or after January 1, 1992, and failure to renew does not place the work in the public domain. *See* Copyright Renewal Act of 1992, 11 U.S.C. § 304(a) (as amended). The Show was created and copyrighted prior to 1978. The duration of protection and renewal guidelines are therefore governed by the

**Memorandum Opinion and Order and Permanent Injunction - Page 6**

The 1909 Act also provided protection for copyrighted works that are incorporated in later works, commonly known as "derivative works." 1909 Act, 17 U.S.C. § 7. Section 7 provides that:

> Compilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; *but the publication of any such new work shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.*

1909 Act, 17 U.S.C. § 7 (emphasis added) (repealed 1978). "Derivative work," though not specifically defined in the 1909 Act, is defined by the 1976 Copyright Act as:

> a work *based upon* one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, *or any other form in which a work may be recast, transformed, or adapted.* A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101 (emphasis added).[5] The legislative history reveals the broad scope of the term "derivative work." *See* H.R. Rep. No. 94-1476, 94th Cong., 2d Sess., p. 57 ("Between them the terms 'compilations' and 'derivative works' which are defined in section 101, comprehend every copyrightable work that employs preexisting material or data of any kind."). Moreover, "the full

---

1909 Act. *See* 1976 Act, 17 U.S.C. § 301(b)(2).

[5]Contrary to Defendant's argument, there is no requirement that the copyright registration certificate designate a work as a "derivative work" in order for the work to be deemed derivative. *See generally Pritchett v. Pound*, 473 F.3d 217, 219-20 (5th Cir. 2006) (designations on copyright registration certificates not conclusive).

**Memorandum Opinion and Order and Permanent Injunction - Page 7**

force of the copyright in the pre-existing work is preserved despite incorporation into the derivative work." *Steward v. Abend*, 495 U.S. 207, 223-24 (1990) (citing section 7 of the 1909 Act).

### 3. Copyright Infringement

To establish a defendant's liability for copyright infringement, a plaintiff must prove that: (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original. *Positive Black Talk Inc. v. Cash Money Records, Inc.,* 394 F.3d 357, 367 (5th Cir. 2004) (citing *General Universal Sys. v. Lee,* 379 F.3d 131, 141 (5th Cir. 2004)). With respect to the first element, "[c]opyright ownership is shown by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Eng'g Dynamics v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994). To establish the second element, a plaintiff must prove: (1) factual copying and (2) substantial similarity. *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 576 (5th Cir. 2003).

As to the first element, Reel Media has stipulated that the copyrights in the first seventy-nine episodes of the Show were properly registered, timely renewed, and currently remain in effect. *See* Pl. App. at 5. Under established principles of copyright law, Plaintiff's ownership of the copyright in the first seventy-nine episodes gives it the exclusive rights to reproduce copyrighted work, prepare derivative works, and distribute copies. 17 U.S.C. § 106(2). A person who violates this exclusive right is a copyright infringer. *Id.* § 501(a). A "derivative work" that is substantially similar to the original work upon which it is based is an infringement. *Atkins v. Fischer*, 331 F.3d 998, 993 (D.C. Cir. 2003) (and cases cited therein); *TMTV, Corp. v. Mass Productions, Inc.*, 345 F.Supp.2d 196, 208 (D. Puerto Rico 2004) (same). As stated by the Supreme Court, "[t]he aspects of a derivative work added by the derivative author are that author's property, but the element drawn

from the pre-existing work remains on grant from the owner of the pre-existing work." *Stewart v. Abend*, 495 U.S. 207, 223-24 (1990). Having reviewed several of the first seventy-nine episodes, the unopposed written summaries submitted by Plaintiff, as well as the 16 Middle Episodes submitted to the court by the parties, the court has little trouble determining that the 16 Middle Episodes are "derivative" of the first seventy-nine episodes. The 16 Middle Episodes have the following episode numbers and titles:

Episode 80 - "High Noon in Mayberry"

Episode 81 - "The Loaded Goat"

Episode 82 - "Class Reunion"

Episode 83 - "Rafe Hollister Sings"

Episode 84 - "Opie and the Spoiled Kid"

Episode 85 - "The Great Filling Station Robbery"

Episode 86 - "Andy Discovers America"

Episode 87 - "Aunt Bee's Medicine Man"

Episode 88 - "The Darlings are Coming"

Episode 89 - "Andy's English Valet"

Episode 90 - "Barney's First Car"

Episode 91 - "The Rivals"

Episode 92 - "A Wife for Andy"

Episode 93 - "Dogs, Dogs, Dogs

Episode 94 - "Mountain Wedding"

Episode 95 - "The Big House"

The 16 Middle Episodes concern the *same* characters as the pre-existing copyrighted first seventy-nine episodes, namely, Sheriff Andy Taylor, Deputy Barney Fife, Aunt Bee and Opie Taylor. Reel Media has stipulated that the characters, such as Andy Taylor and Barney Fife, are sufficiently distinctive and delineated to be independently copyrightable.[6] Further, the 16 Middle Episodes contain the *same* film footage and soundtrack for the opening sequence (showing Andy and Opie walking to the fishing hole while a tune is whistled in the background). The 16 Middle Episodes contain many of the same recurring themes from the initial seventy-nine episodes, including among others: the theme of Andy Taylor as a single father raising his son, Opie, and Aunt Bee as a sort of surrogate mother, both teaching Opie moral lessons; and the relationship between Sheriff Andy Taylor and Deputy Barney Fife, where, to borrow Plaintiff's apt description, Andy is "laid back" and Barney is his "high-strung overzealous deputy." Pl. Brief at 4. Finally, the primary settings and sets are the same, namely, the Sheriff's office, the jail and Andy's living room.

Moreover, Paramount's failure to renew the copyright in the 16 Middle Episodes does not alter the court's determination. *See, e.g., Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1979), *cert. denied sub nom. Drebin v. Russell*, 446 U.S. 952 (1980) (cited with approval in *Steward*, 495

---

[6] Reel Media's argument that none of these main characters was separately copyrighted is irrelevant to the court's analysis of whether the 16 Middle Episodes are "derivative work." *See generally Warner Bros. Inc. v. American Broad. Co.*, 720 F.2d 231, 235 (2d Cir. 1983) ("Plaintiffs own the copyrights in various works embodying the character Superman and have thereby acquired copyright protection for the character itself."); *see also Anderson v. Stallone*, No. 87-0592, 1989 WL 206431, at *8 (C.D. Cal. Apr. 15, 1999) (Pl. App. at 76-89) (Characters of *Rocky* are "one of the most highly delineated group of characters in modern American cinema" and "court has no difficulty ruling as a matter of law that the *Rocky* characters are delineated so extensively that they are protected from bodily appropriation when taken as a group and transposed into a sequel by an author.") In *Anderson*, the court granted Sylvester Stallone's counterclaim for infringement, holding that a treatment of *Rocky IV* was derivative where the main characters from the three prior *Rocky* films were "lifted lock, stock and barrel" and the treatment "retained the names, relationships and built upon the experiences of these characters from the prior Rocky movies." *See id.* In this case, Reel Media has stipulated that the characters such as Andy Taylor and Barney Fife are sufficiently distinctive and delineated to be independently copyrightable. *See* Pl. App. at 5-6. The law imposes no further requirement on Plaintiff to actually copyright them. Moreover, Reel Media does not dispute that these distinctive and delineated characters from the initial validly copyrighted seventy-nine episodes are featured in and appear throughout each of the 16 Middle Episodes.

U.S. at 223). *Russell* involved rights to the film version of *Pygmalion*, a play by George Bernard Shaw. In 1935, Shaw licensed rights to produce a film based on his published, copyrighted play. In 1966, the copyright in the film expired through a failure to timely renew. Copyright in the play, *Pygmalion*, continued until 1988. Defendant began distributing the film, part of the public domain, in 1972. The owners of the play brought a claim against them for copyright infringement. The Ninth Circuit held that because parts of the film used the underlying work (the play) which was still copyrighted, authorization from the owner of the underlying copyrighted work was needed prior to renting the film for exhibition. As stated by the court:

> Thus we reaffirm . . . the well-established doctrine that a derivative copyright protects only the new material contained in the derivative work, not the matter derived from the underlying work. *Thus, although the derivative work may enter the public domain, the matter contained therein which derives from a work still covered by statutory copyright is not dedicated to the public*. The established doctrine prevents unauthorized copying or other infringing use of the underlying work or any part of that work contained in the derivative product so long as the underlying work itself remains copyrighted. Therefore, since exhibition of the film "Pygmalion" necessarily involved exhibition of parts of Shaw's play, which is still copyrighted, plaintiffs here may prevent defendants from renting the film for exhibition without their authorization.

*Russell*, 612 F.2d at 1128 (emphasis added) (internal citations and footnotes omitted). *See also Filmvideo Releasing Corp. v. Hastings*, 668 F.2d 91, 92-93 (2d Cir. 1981) (enjoining distribution of the derivative "Hopalong Cassidy" motion pictures where copyright not timely renewed, since defendant's unauthorized use infringed plaintiff's subsisting copyrights in the preexisting "Hopalong Cassidy" books); *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 720-21 (9th Cir. 1984) (valid copyrights underlying certain radio scripts prevented third-party exploitation of unprotected tapes based on those scripts).

As to the second element, the court need not undertake an extensive analysis of whether the 16 Middle Episodes are "substantially similar" to the first seventy-nine episodes. It is uncontroverted that the 16 Middle Episodes are exact copies of works created and distributed by CBS (or its predecessors), with the same character names and the same relationships between the characters. *See* 3 M. Nimmer The Law of Copyright,§ 13.03[3], p. 13-35 (1988) ("Where there is literal similarity . . . [i]t is not necessary to determine the level of abstraction at which similarlity ceases to consist of an 'expression of ideas' since literal similarity by definition is always similarity as to the expression of ideas."); *see also Anderson*, *supra* at n.6; *TMTV Corp.*, 345 F.Supp.2d at 207-08 (due to similarities in characters, sets and the "total concept and feel," episodes of a Spanish language television series produced and broadcast after the pilot episode were derivative of pilot episode and therefore infringing).

In sum, the court determines that the 16 Middle Episodes are "derivative works." As detailed above, they are based upon and incorporate pre-existing material from the copyrighted first seventy-nine episodes. Though the plots may be slightly different, each episode contains the same opening sequence, contains and features the same primary characters of Andy Taylor, Barney Fife, Aunt Bee and Opie, and concerns the same relationships between the characters and the same recurrent themes in the same fictional town of Mayberry. As already stated, under the Copyright Act, as copyright holder, CBS has the exclusive right to prepare derivative works and distribute copies. *See* 17 U.S.C. § 106(2). Because Reel Media has violated and continues to violate this exclusive right, Reel Media is liable for copyright infringement. *Id.* § 501(a).

## IV. CBS's Request for Permanent Injunction

CBS next seeks to enjoin Reel Media from further infringing its copyrights. CBS alleges in its Complaint that Reel Media's conduct is causing and, unless enjoined and restrained, will continue to cause CBS great and irreparable injury that cannot fully be compensated or measured in money. In its request for permanent injunctive relief, CBS asks the court to: (i) enjoin Reel Media from "advertising, reproducing, manufacturing, marketing, distributing, promoting, performing, offering to sell, selling, and/or licensing any episodes of" the Show, or participating in infringement of the Show by others (Compl. at 8); (ii) to direct Reel Media to "deliver up for disposal and destruction all infringing episodes of the [Show] in their custody, possession or control, and all molds, stencils, plates, masters, negatives and other articles by means of which copies may be reproduced" (*id.*); and direct Reel Media to recall all copies of the 16 Middle Episodes which it sold or distributed from each of its customers.

Section 502 of the Copyright Act authorizes the district court to grant final injunctions to prevent or restrain infringement of a copyright. *Alcatel USA v. DGI Technologies*, 166 F.3d 772, 790 (5th Cir. 1999). Section 502(a) of the Copyright Act states: "Any court having jurisdiction of a civil action arising under this title may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Section 503(b) provides that:

> As part of a final judgment or decree, the court may order the destruction or other reasonable disposition of all copies or phonorecords found to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced.

A copyright owner is entitled to an injunction prohibiting further infringement if the owner shows: (1) actual success on the merits, (2) no adequate remedy at law, (3) the threatened injury outweighs any damage to the defendant, and (4) the injunction will not disserve the public interest. *Arista Records, Inc. v. Kabani,* No. Civ. 3:03-CV-1191-H, 2004 WL 884445, at *4 (N.D.Tex. Apr. 23, 2004) (Sanders, J.) (citing *DSC Communications Corp. v. DGI Tech., Inc.,* 81 F.3d 597, 600 (5th Cir. 1996)). In short, an injunction is appropriate if liability has been established and if there is a substantial likelihood of further copyright infringement. *Fermata Int'l Melodies, Inc. v. Champions Golf Club Inc.,* 712 F.Supp. 1257, 1262 (S.D.Tex. 1989), *aff'd,* 915 F.2d 1567 (5th Cir. 1990); *see also Pac. & S. Co., Inc. v. Duncan,* 744 F.2d 1490, 1499 (11th Cir. 1984) (past infringement and substantial likelihood of future infringements normally entitle the copyright holder to permanent injunction against the infringer pursuant to 17 U.S.C.A. § 502(a)).

In this case, based on the undisputed facts, Plaintiff has succeeded on the merits of its copyright infringement claim. Moreover, Plaintiff has no adequate remedy at law. Reel Media's continuing distribution for broadcast of the 16 Middle Episodes in the course of its business shows that threat of suit or statutory damages has not been an effective deterrent. Without an injunction, the 16 Middle Episodes would remain vulnerable to continued infringement by Reel Media. The burden that would be imposed on Reel Media, if any, to refrain from further infringements is light in comparison to the threatened injury to CBS, should such infringement continue to occur. Moreover, Reel Media has failed to present any argument that entry of a permanent injunction will be a burden on it. Finally, the public interest is advanced by enforcing compliance with the laws of the United States. *See Playboy Enterprises, Inc. v. Webbworld, Inc.,* 991 F.Supp. 543, 561 (N.D.Tex. 1997) (Sanders, J.). On balance, these factors all weigh in favoring of granting a permanent

injunction against Reel Media and preventing further illegal distribution and broadcast of the 16 Middle Episodes.

As stated above, however, the court may enter an injunction only "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The court has considered Plaintiff's request for injunctive relief and determines that it should be granted insofar as it is reasonable to prevent or restrain further infringement of CBS's copyright. Specifically, the court finds reasonable all portions of CBS's request for permanent injunctive relief, with the exception of its request that the court order Reel Media to deliver up for "destruction and disposal (as CBS deems appropriate) all infringing copies of episodes of the Show in their custody, and all molds, stencils, plates, masters, negatives and other articles by means of which copies may be reproduced." Compl. at 8. In the Stipulated Facts for Summary Judgment, Reel Media stipulates that it has "sold, distributed, and/or licensed copies of the 16 Middle Episodes of *The Andy Griffith Show* to, among others, television stations." Pl. App. at 6. The court finds no evidence in the summary judgment record that Reel Media reproduced or copied the 16 Middle Episodes. Mere possession of the episodes is not an infringement. Moreover, in its legal briefing to the court, CBS has failed to explain why a prohibitive injunction is not sufficient to achieve its objective of stopping future infringement. In sum, the court will enjoin Reel Media from "advertising, reproducing, manufacturing, marketing, distributing, promoting, performing, offering to sell, selling, and/or licensing any episodes of" the Show, or participating in infringement of the Show by others and will direct Reel Media to recall all copies of the 16 Middle Episodes which it sold or distributed from each of its customers. CBS, of course, with supporting authority and facts, may seek modification of the terms of the permanent injunction.

## V. Reel Media's Motion for Summary Judgment on Liability

Reel Media has moved for summary judgment on liability, contending that its unauthorized sale and distribution of the 16 Middle Episodes is not infringing, since the copyrights in the 16 Middle Episodes were not timely renewed and they are now in the public domain. As the court has already rejected this argument and determined that Reel Media is liable for copyright infringement (*see supra*), granting Reel Media's summary judgment motion would be inconsistent with such ruling. Accordingly, the court denies Reel Media's motion for summary judgment on liability.

## VI. Conclusion

Based on the foregoing, the court determines that Defendant Reel Media has failed to raise a genuine issue of material fact regarding CBS's claims for copyright infringement. Accordingly, the court **grants** Plaintiff's Motion for Summary Judgment, and **denies** Defendant's Motion for Summary Judgment on Liability. The court hereby **directs** the parties to confer regarding an agreed amount of damages and inform the court in writing by **5:00 p.m. on Monday, August 27, 2007** whether an agreement has been reached as to the amount of damages.

## PERMANENT INJUNCTION

For the reasons stated in this opinion and order, the court issues this permanent injunction. Accordingly, it is ORDERED, ADJUDGED and DECREED that Reel Media, its agents, servants, employees, contractors and all persons, firms, corporations, or entities acting under its direction, authority, or control, and all persons acting in concert with any of them, shall be and are hereby **permanently enjoined** from advertising, reproducing, manufacturing, distributing, promoting, performing, offering to sell, selling, and/or licensing any episodes of *The Andy Griffith Show*, and

from infringing, or contributing to, or participating in the infringement by others of, CBS's copyrights in episodes of *The Andy Griffith Show*.

It is further ORDERED, ADJUDGED and DECREED that Reel Media its agents, servants, employees, contractors and all persons, firms, corporations, or entities acting under its direction, authority, or control, and all persons acting in concert with any of them, shall **recall** all copies of the 16 Middle Episodes of *The Andy Griffith Show* which it sold or distributed from each of its customers, and **instruct** all such customers not to distribute or broadcast such episodes.

Finally, it is ORDERED, ADJUDGED and DECREED that the duration of this permanent injunction is strictly limited to the time period set forth in § 304 of the Copyright Act of 1976 (67 years from the commencement of the renewal term) as to each of the first seventy-nine episodes of *The Andy Griffith Show*.

**It is so ordered** this 13th day of August, 2007.

Sam A. Lindsay
United States District Judge